Donald L. Swanson (NE Bar No 16385)
*Admitted Pro Hac Vice 1/10/19*
Koley Jessen P.C., L.L.O.
1125 S. 103rd St., Ste 800
Omaha, NE 68124
Telephone (402) 343-3726
Facsimile (402) 390-9005
Don.swanson@koleyjessen.com

Matthew L. Johnson (6004)
Russell G. Gubler (10889)
Ashveen S. Dhillon (14189)
JOHNSON & GUBLER, P.C.
8831 West Sahara Avenue
Las Vegas, NV 89117
Telephone (702) 388-1996
Facsimile (702) 471-0075
mjohnson@mjohnsonlaw.com

*Attorneys for Infogroup, Inc.*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| In Re:<br><br>DATABASEUSA.COM LLC,<br><br>Debtor | Case No. BK-S-19-10001-BTB<br><br>Chapter 11 |

**MOTION OF INFOGROUP, INC. FOR AUTHORITY TO PURSUE CLAIMS OF THE BANKRUPTCY ESTATE AGAINST EVEREST GROUP, LLC, VINOD GUPTA, RESEARCH USA LLC, THE INSIDER TRANSFEREES OF RESEARCHUSA, RED FOX INDUSTRIES, INC., and ROBINS KAPLAN LLP**

Infogroup, Inc., ("Infogroup"), a creditor, through its attorneys, Donald L. Swanson, of the law firm of Koley Jessen P.C., L.L.O., and Matthew L. Johnson, of the law firm of Johnson & Gubler, P.C., hereby seeks a Court Order granting authority for Infogroup to pursue claims on behalf of this

bankruptcy estate against Everest Group, LLC ("Everest"), Vinod Gupta ("Gupta"), Research USA LLC ("ResearchUSA"), and the insider transferees of ResearchUSA: Fred Vakili ("Vakili"), Vijay Malik ("Malik"), Rakesh Gupta, Agarwal Data Companies ("Agarwal") (collectively, the "Insider Transferees"), Red Fox Industries, Inc. ("Red Fox"), and Robins Kaplan LLP ("Robins Kaplan") as set forth below. In support of this motion, Infogroup states as follows:

1.    Debtor filed its Voluntary Petition for Relief under Chapter 11 of the Bankruptcy Code on January 1, 2019 ("Petition Date") and is a "Debtor-in-Possession" as defined in 11 U.S.C. § 1101(1).

2.    The Court has jurisdiction for the relief requested herein under 28 U.S.C. § 1334. This is a core proceeding under 28 U.S.C § 157(b). The legal basis for the relief requested herein is explained in *In re Curry and Sorensen, Inc.*, 57 B.R. 824, 828 (9th Cir. BAP 1986), in *In re Hashim,* 379 B.R. 912, 920-22 (9th Cir. BAP 2007), and in *PW Enterprises, Inc. v. North Dakota Racing Comm'n (In Re Racing Service, Inc.*), 540 F.3d 892 (8th Cir. 2008), as discussed in detail below.

**Debtor Has Refused to Acknowledge and Has Waived the Right To Pursue Claims of the Bankruptcy Estate Against Everest, ResearchUSA, Gupta, and the Insider Transferees**

3.    On February 20, 2019, Debtor filed its Motion for authority to obtain post-petition financing from Everest (Doc. 68), in which Debtor stipulated, acknowledged and agreed that Everest's pre-petition claim is a "validly perfected" and "first priority security interest," is "absolutely and unconditionally due and payable," is "not subject to any offset, defense, claim, counterclaim or diminution," and is "not subject to avoidance pursuant to applicable state or federal laws." Additionally in such Motion, Debtor "waives any right to raise any defense, offset, or counterclaim with respect to" Everest's claim.

4.    In its Objection (Doc. 86) to such Motion, Infogroup's representations include as follows:

2

a.    As to Infogroup's descriptions of the inadequacy and avoidability of Everest's pre-petition lien claims:

> i. "Everest's pre-petition liens were never properly created, and cannot be maintained or supported on a variety of grounds, such as insider preferences and fraudulent transfers. Examples include, (i) inadequate descriptions of collateral in security agreements, and (ii) a failed effort in February 2018 to correct description deficiencies" (par. 5).

> ii. "Everest's claim to perfection is a fraudulent or preferential transfer that may be avoided by this Court" (par. 9).

> iii. "Accordingly, all of Everest's security interest claims are either unenforceable under Nevada law because they were inadequately described and thus no security interest was ever created (until at least February 2018), or they are voidable as insider preferences or fraudulent transfers" (par. 15).

b.    As to potential remedies, such as equitable subordination, alter ego, preference, and fraudulent transfer claims against Everest:

> "Infogroup is entitled to a full and fair opportunity to examine all documents and all advances and credits upon which Everest's claim is based and to obtain full discovery thereon, as a precondition for objecting to Everest's claim or seeking authority to pursue such remedies as equitable subordination, alter ego, preference and fraudulent transfer" (par. 37).

**Debtor's Actions Regarding Such Claims**

5.    Thereafter, instead of acting to pursue such claims on behalf of the bankruptcy estate, Debtor:

a.    Sought and obtained an Order (Doc. 106) approving the Doc. 68 Motion, which (at Infogroup's insistence) preserved the right of Infogroup "to challenge Everest's pre-petition claim or pre-petition liens";

b.      Filed a second Motion for authority to increase post-petition financing from Everest (Doc. 180). As before, Debtor stipulated, acknowledged and agreed (in this second Motion) that Everest's pre-petition claim is a "validly perfected" and "first priority security interest," is "absolutely and unconditionally due and payable," is ""not subject to any offset, defense, claim, counterclaim or diminution," and is "not subject to avoidance pursuant to applicable state or federal laws." Additionally, in such Motion, Debtor again waived "any right to raise any defense, offset, or counterclaim with respect to" Everest's claim.

c.      Then, Debtor sought and obtained an Order (Doc. 197) approving the Doc. 180 Motion, which (at Infogroup's insistence) preserved "Infogroup's rights as a creditor to challenge Everest's pre-petition claim or pre-petition liens" and to "assert any claims or or rights Infogroup may have against Debtor, it being the intent of Debtor and Infogroup that all rights are reserved."

### Debtor Has Refused to Acknowledge the Right To Pursue Claims of the Bankruptcy Estate Against Red Fox

6.      On or about January 30, 2019, Debtor issued a post-petition payment in the amount of One Hundred Eighty Thousand Dollars ($180,000.00) pursuant to Red Fox invoice No. ███████, ██████████ — ████████████████████ (the "Red Fox Payment").

7.      Red Fox is ████████████ based on Debtor's ████████████████ ████.

8.      The Red Fox Payment is subject to avoidance pursuant to 11 U.S.C. § 549(a), but (i) Debtor has failed or refused to pursue recovery of the Red Fox Payment, (ii) Debtor scheduled debt to

Red Fox in the amount of $6,108.14, and (iii) Debtor failed to include the Red Fox Payment in its Motion (Doc. 59 & 83), Order (Doc. 92) and supporting Declaration (Doc. 84) for authority to pay pre-petition claims.

**Debtor Has Refused to Acknowledge the Right To Pursue Claims of the Bankruptcy Estate Against Robins Kaplan**

9.     Robins Kaplan currently represents Debtor in several matters, including its appeal of Infogroup's multi-million dollar judgment against Debtor.

10.     Debtor issued three checks to Robins Kaplan on October 31, 2018, none of which were immediately deposited by Robins Kaplan.

11.     Such checks cleared Debtor's bank account as follows:

| Check No. | Check Date | Amount | Clear Date |
|-----------|-----------|--------|-----------|
| 1733 | 10/31/18 | $291,950.84 | 12/4/18 |
| 1734 | 10/31/18 | $55,846.20 | 11/20/18 |
| 1732 | 10/31/18 | $143,268.54 | 1/2/19 |

12.     Robins Kaplan has returned the amounts received after the Petition Date, including funds received pursuant to Check No. 1732.

13.     Robins Kaplan has not returned the amounts received pursuant to Check Nos. 1733 and 1734 totaling $347,797.04 (the "Robins Kaplan Preference Period Payments").

14.     Robins Kaplan Preference Period Payments are subject to avoidance pursuant to 11 U.S.C. § 547, but Debtor has failed or refused to pursue recovery of the Robins Kaplan Preference Period Payments.

5

**Proposed Complaint and Proposed Fee Arrangement**

15.     Attached hereto as <u>Exhibit I</u> is a draft Complaint that Infogroup proposes to pursue against Everest, ResearchUSA, Gupta, the Insider Transferees, Red Fox and Robins Kaplan.

16.     Infogroup proposes to pursue such claims at its own expense, subject to the possibility of presenting a request to the Court, at an appropriate time, for allowance of an administrative expense in the Court's discretion on such grounds as authorized under 11 U.S.C. § 503(b) (*see, e.g., In re Hashim,* 379 B.R. 912, 920-22 (9th Cir. BAP 2007)), or on other or similar grounds.

**Legal Authorities and Their Application**

17.     The applicable rule in the Ninth Circuit was established in *In re Curry and Sorensen, Inc.*, 57 B.R. 824, 828 (9th Cir. BAP 1986) (emphasis added), as follows:

> The exclusive power to commence avoidance actions vested in trustees and debtors-in-possession is permissive rather than mandatory and the exercise of this power can only be reviewed for abuse of discretion.
>
> If a creditor is dissatisfied with lack of action on the part of the debtor-in-possession, *the creditor may . . . petition the court to compel the debtor-in-possession to act or to gain court permission to institute the action itself.*

Similar rules are found across the various circuits. The Eighth Circuit has, for example, established a four element test for derivative standing, in which a creditor must show: (1) it petitioned the trustee/debtor-in-possession to bring the claims and the trustee/debtor-in-possession refused; (2) its claims are colorable; (3) it sought permission from the bankruptcy court to initiate an adversary proceeding; and (4) the trustee/debtor-in-possession unjustifiably refused to pursue the claims (*PW Enterprises, Inc., v. North Dakota Racing Comm'n (In re Racing Service, Inc.)*, 540 F.3d 892, 900 (8th Cir. 2008)).

18.     The four *PW Enterprises* elements apply to the matter at hand as follows:

a.  Element 1 (petition and refusal) is satisfied by the demands set forth below and by the Debtor's stipulations and waivers regarding Everest's claims identified above;

b.  Element 2 (colorable claims) is satisfied by the explanations of claims set forth in Doc. 86 herein and by the attached <u>Exhibit I</u> Complaint;

c.  Element 3 (sought permission) is satisfied by Infogroup's multiple reservations of the right to challenge Everest's pre-petition claim or pre-petition liens as described above and the requests for relief contained in this Motion; and

d.  Element 4 (unjustifiable refusal) is discussed in the next paragraphs.

19.    In evaluating Element 4 (whether the Debtor-in-possession unjustifiably refuses to bring a creditor's proposed claims), according to *PW Enterprises,* bankruptcy courts need to perform a cost-benefit analysis. Non-exhaustive factors a court should consider in conducting such an analysis are: (1) the probabilities of legal success and financial recovery in event of success, (2) the creditor's proposed fee arrangement, and (3) the anticipated delay and expense to the bankruptcy estate that the initiation and continuation of litigation will likely produce (*see* 540 F.3d at 901). In conducting such analysis, a mini-trial is not needed, but a court's decision needs to be supported by "written or oral explanation that reflects it conducted the appropriate cost-benefit analysis" (*id.*).

20.    Here is how the three *PW Enterprises* factors for Element 4 apply to this motion:

a.  Factor 1—Probabilities. (a) The probabilities of legal success are high for the claims identified in the attached <u>Exhibit I</u> Complaint, especially given (i) the close insider and control relationships among Debtor, Everest and Gupta (which relationships require close scrutiny), (ii) the persistent failures of Debtor and Everest to produce subpoenaed documents over extended periods of time, (iii) Infogroup's federal court

judgment against Debtor and Gupta for wrongful conduct (*see* Proof of Claim # 1-1); and (b) the probabilities of financial recovery in event of success are also high, since avoidance and equitable subordination remedies are self-executing and since Everest has shown by pre-petition and post-petition funding efforts that it is capable of responding to a money judgment.

b.      Factor 2—Fee Arrangement. Infogroup's proposed fee arrangement is that Infogroup, (i) will fund the litigation, and (ii) will be entitled to a reimbursement from the bankruptcy estate only in the event the Court, in its discretion, allows such reimbursement.

c.      Factor 3—Anticipated Delay and Expense to Estate.

(1) Delay. The only delay is in the time between, (i) when the Debtor-in-possession could have brought and prosecuted such claims, absent the close connections involved, and (ii) when Infogroup is allowed to bring and prosecute such claims. Such delay has been caused by the persistent failures of Debtor and Everest to produce subpoenaed documents containing critical information. In February 2019, Infogroup served subpoenas requesting documents containing information critical to the bankruptcy including (i) the identity of the the owner of Debtor's largest asset—the business database that Debtor uses to run its business—and (ii) when certain backdated[1] amended loan documents purporting to create a secured interest in Debtor's property

---

[1] The amended loan documents are backdated insofar as they do not reflect the actual date of execution, which occurred during the preference period. Instead, Debtor attempted to benefit Everest by providing for an effective date years earlier without disclosing the actual date of execution. Infogroup's use of "backdated" in this motion and attached complaint is based on this understanding.

were drafted and executed. Almost a year after the initial subpoena was served, in January 2020, Debtor finally disclosed some of the subpoenaed information.

(2) Expense. There should be little-to-no difference between what the expense would have been for Debtor-in-possession to have filed and prosecuted such claims against non-insiders and what the same expense to the estate will be for Infogroup to file and prosecute such claims against insiders—with one major difference: the expense to the bankruptcy estate for an action by Infogroup will be $0.00, unless the Court, in its discretion, decides otherwise.

21.    Moreover, the three factors on Element 4, from *PW Enterprises*, are not exhaustive. Additional compelling factors include the following:

a.    This Chapter 11 case is being prosecuted for the sole purpose of preventing Infogroup from collecting on its federal court judgment against Debtor in amounts exceeding $11.6 million (*see* Proof of Claim # 1-1);

b.    Since Debtor is owned and controlled by Everest, and since Everest is owned and controlled by Gupta, this Chapter 11 case is being prosecuted for the primary benefit of, and to protect the interests of, Everest and Gupta, to the intended and sole detriment of Infogroup;

c.    Debtor, Everest and Gupta elected to put Debtor into this Chapter 11 case to avoid posting a supersedeas bond pending appeal of the federal court judgment, even though such persons had the capacity to post such a bond for Debtor; and

d.    Debtor is using the protections of bankruptcy, while attempting to (i) prevent or delay the discovery of pertinent information and (ii) prevent the prosecution of claims against Debtor's insiders, which claims are authorized by the Bankruptcy Code.

**Demands to Debtor and Request for Relief**

22.    As a matter of form, Infogroup hereby demands that Debtor bring the claims identified above against Everest, Gupta, ResearchUSA and the Insider Transferees. Infogroup notes, however, that Debtor is irreconcilably conflicted on all such claims because of its insider status with the proposed defendants and its prior waivers of claims, so it cannot not reasonably or logically comply with such form demand.

23.    Infogroup hereby demands that Debtor bring the claims identified above against Red Fox. Infogroup notes, however, that Debtor may be irreconcilably conflicted on such claim because of its connections with Red Fox.

24.    Infogroup hereby demands that Debtor bring the claims identified above against Robins Kaplan. Infogroup notes, however, that Debtor may be conflicted on such claims because Robins Kaplan is currently serving as Debtor's attorney in several matters.

25.    In the event of Debtor's inability and/or its conflicted status (in light of the stipulations, waivers, and conflicts noted above) to pursue such claims, Infogroup requests an order authorizing Infogroup to pursue such claims against Everest, ResearchUSA, Gupta, the Insider Transferees, Red Fox and Robins Kaplan, on behalf of the bankruptcy estate.

WHEREFORE, Infogroup, Inc. moves the Court for an order granting the relief requested above.

DATED this 24th  day of February 2020.

10

1

2

     /s/ Matthew L. Johnson

Donald L. Swanson (NE Bar No 16385)

3

*Admitted Pro Hac Vice 1/10/19*

Koley Jessen P.C., L.L.O.

4

1125 S. 103rd St., Ste 800

5

Omaha, NE 68124

Telephone (402) 343-3726

6

Facsimile (402) 390-9005

Don.swanson@koleyjessen.com

7

8

Matthew L. Johnson (6004)

Russell G. Gubler (10889)

9

Ashveen S. Dhillon (14189)

8831 West Sahara Avenue

10

Las Vegas, NV 89117

Telephone (702) 388-1996

11

Facsimile (702) 471-0075

mjohnson@mjohnsonlaw.com

12

13

*Attorneys for Infogroup, Inc.*

14

15

16

17

18

19

20

21

22

23

24

25

26

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that I am an employee of Johnson & Gubler, P.C., and that on February 24, 2020, I caused to be served a true and correct copy of the MOTION OF INFOGROUP, INC. FOR AUTHORITY TO PURSUE CLAIMS OF THE BANKRUPTCY ESTATE AGAINST EVEREST GROUP, LLC, VINOD GUPTA, RESEARCH USA LLC, AND THE INSIDER TRANSFEREES OF RESEARCHUSA in the following manner:

[X]    a.    Electronic Service

Under Administrative Order 02-1 (Rev. 8-31-04) of the United States Bankruptcy Court for the District of Nevada, the above-referenced document was electronically filed on the date hereof and served through the Notice of Electronic Filing automatically generated by that Court's facilities.

[X]    b.    United States Mail

By depositing a copy of the above-referenced document for mailing in the United States Mail, first class postage prepaid, at Las Vegas, Nevada, to the parties listed below at their last known mailing addresses, on the date above written.

Everest Group LLC
Attn: Incorp Services, Inc., R.A.
3773 Howard Hughes Pkway., Ste. 500S
Las Vegas, NV 89169

T. Randall Wright
Baird Holm LLP
1700 Farnam Street, Suite 1500
Omaha, NE 68102-2068

I declare under penalty of perjury that the foregoing is true and correct.

Dated: February 24, 2020.

                          <u>/s/  Annabelle Nudo</u>
                          An Employee of Johnson & Gubler, P.C.

12

# EXHIBIT "I"

# EXHIBIT "I"

# EXHIBIT "I"

1    Donald L. Swanson (NE Bar No 16385)
   *Admitted Pro Hac Vice 1/10/19*
2    Koley Jessen P.C., L.L.O.
3    1125 S. 103rd St., Ste 800
   Omaha, NE 68124
4    Telephone (402) 343-3726
   Facsimile (402) 390-9005
5    Don.swanson@koleyjessen.com

6    Matthew L. Johnson (6004)
7    Russell G. Gubler (10889)
   Ashveen S. Dhillon (14189)
8    JOHNSON & GUBLER, P.C.
   8831 West Sahara Avenue
9    Las Vegas, NV 89117
   Telephone (702) 388-1996
10    Facsimile (702) 471-0075
11    mjohnson@mjohnsonlaw.com

12    *Attorneys for Infogroup Inc.*

13         **UNITED STATES BANKRUPTCY COURT**
14             **DISTRICT OF NEVADA**

15    In Re:

16    DATABASEUSA.COM LLC,         Case No. BK-S-19-10001-BTB

17        Debtor                Chapter 11

18

19    INFOGROUP INC., on behalf of the Bankruptcy     Adv. No.
   Estate of DATABASEUSA.COM LLC,

20

21        Plaintiff,

22       v.

23    EVEREST GROUP, LLC, a Delaware limited
   liability company; RESEARCH USA LLC, a
24    Delaware limited liability company; VINOD
   GUPTA, an individual; ▮▮▮▮▮▮▮▮▮▮▮
25              an individual; ▮▮▮▮▮▮▮▮▮▮
   ▮▮▮▮▮▮ an individual; ▮▮▮▮▮▮▮▮▮, an
26

1

individual; ███████████████████, a
company of ███████;
███, a New Jersey corporation; and ROBINS
KAPLAN LLP, a Minnesota limited liability
partnership.

Defendants.

# COMPLAINT

Creditor Infogroup Inc., ("Infogroup"), for and on behalf of the bankruptcy estate (the "Estate")

of DatabaseUSA.com LLC ("Debtor"), by and through its undersigned attorneys, files this adversary

complaint (the "Complaint") and states and alleges as follows:

## JURISDICTION AND VENUE

1.       This adversary proceeding arises out of Debtor's Chapter 11 bankruptcy case and is

commenced pursuant to Chapter 5 and 11 U.S.C. U.S.C. § 510 of the Bankruptcy Code (11 U.S.C. §

501 et al.), Rule 7001 of the Federal Rules of Bankruptcy Procedure, and Nevada law.

2.       This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157

and 1334.

3.       This is a "core" proceeding pursuant to 28 U.S.C. § 157(b)(2).

4.       Infogroup consents to entry of a final order or judgment by this Court.

## PARTIES

5.       Infogroup is a Delaware corporation with its principal place of business located at 1020

E 1st Street, Papillion, Nebraska 68046. Infogroup was awarded the right to pursue all claims of the

Estate, including claims for avoidance as preferences and fraudulent transfers under Chapter 5 (11

2

U.S.C. § 501 et al.), equitable subordination under 11 U.S.C. U.S.C. § 510, and alter ego (collectively, "Claims of the Estate") pursuant to this Court's order dated _____ (Filing No. ___).

6.    Infogroup's current business pursuits are varied. In pertinent part, Infogroup is in the business of licensing portions of its database containing a compilation of businesses.

7.    Everest Group, LLC ("Everest") is a Nevada limited liability company with its registered agent located at 3773 Howard Hughes Pkwy, Suite 500S, Las Vegas, Nevada, 89169 - 6014. Everest was at all relevant times a creditor of the Debtor.

8.    Vinod Gupta ("Gupta") is an individual and resident of the State of Nebraska, a former officer, shareholder, and director of Infogroup, the former managing member of Debtor, and a current director of Debtor.

9.    ███████████████████ is an individual who resides at ████████ ███████████████████████████████████████████ of Debtor and a former executive of Infogroup.

10.    ███████████████ is an individual who resides at ███████████████████ █████.

11.    █████████████ is an individual who resides at █████████████████████████.

12.    █████████████████████████████████████ The principal place of business of ███████████████ is not known at this time, but is ascertainable through discovery. ████████████████ purportedly received an ownership interest in Research USA LLC and, upon information and belief, that transaction occurred, at least in part, in Nevada.

13.    Research USA LLC ("ResearchUSA") is a Nevada limited liability company with a registered agent located at 3773 Howard Hughes Pkwy Ste 500S, Las Vegas, Nevada 89169-6014.

ResearchUSA is an entity formerly fully-owned by Debtor, which was purportedly transferred on or about January 1, 2015 to ██████ ██████ ██████ and ██████████ . ███████████████████ █████████████████████████████████████████████████████

14.    ████████████████████████ is a ████████████████ with its principal place of business located at ██████████████████████████████ .

15.    Robins Kaplan LLP ("Robins Kaplan) is a Minnesota limited liability partnership. Robins Kaplan is a law firm which served as Debtor's and Gupta's attorneys in the Nebraska Litigation (defined below) and other related litigation.

## BACKGROUND FACTS

16.    Debtor filed its Voluntary Petition for Relief under Chapter 11 of the Bankruptcy Code (the "Petition") on January 1, 2019 ("Petition Date") and is a "Debtor-in-Possession" as defined in 11 U.S.C. § 1101(1).

### *The Events Preceding Debtor's Petition*

17.    Gupta founded Infogroup in or around 1972.

18.    Gupta guided Infogroup from its infancy and took the company public around 1995.

19.    In July 2010, Infogroup went private and Gupta received approximately $160 million for his stock in the company.

20.    Gupta's departure from Infogroup was fraught with scandal, including a class action lawsuit by Infogroup shareholders against Infogroup, alleging that (i) Gupta was running personal expenses through the company without proper reporting and that (ii) Gupta was engaging in related party transactions without proper disclosure; the lawsuit was later settled.

21.    As Infogroup was a publicly-traded company at the time, the SEC also brought a lawsuit against Gupta based on similar allegations.

22.    On March 17, 2010, a consent judgment was entered against Gupta in the SEC matter, which required Gupta to pay a fine, pay disgorgement, and barred Gupta from ever serving as a director or officer in a publicly traded company again. A true and correct copy of the consent judgment is attached hereto as Exhibit "A".

23.    The foregoing scandal was publicized and became widely known in the business community.

24.    Such chaos formed the backdrop for Gupta's separation from Infogroup and the negotiation of the August 20, 2008 Separation Agreement, which included a $10 Million severance payment plus other benefits to Gupta (the "Separation Agreement").

25.    In July 2010, when Infogroup's current CEO joined Infogroup's board of directors, Infogroup was also facing significant tax liability, to the tune of $15 million, based on Gupta's "excess compensation" related to the allegations described above.

26.    In or around 2010, Gupta started operating a competing database company (Debtor), which he was permitted to do provided that he also complied with his legal and contractual obligations to Infogroup.

27.    On or about September 7, 2011, Infogroup filed suit against Debtor in District Court of Douglas County Nebraska, Case No. CI 11-5969 for theft based on (i) Debtor's prohibited use of Infogroup's marks to confuse potential customers and persuade them to believe that Infogroup and Debtor were one in the same and (ii) Debtor's prohibited use of Infogroup's confidential customer information to unfairly compete, which customer information Debtor obtained, in part, from Tracy

Hyman, a former Infogroup employee and current Debtor employee who refused to return his Infogroup-issued laptop on his resignation from Infogroup, falsely claiming the laptop was stolen (the "2011 Litigation").

28.    On or about ███████████, approximately ███████ after Infogroup initiated the 2011 Litigation and while such case was pending, Debtor purportedly ███████████████████ ████████████████████████.

29.    Debtor did not disclose such purported transfer of ownership in ███████████ Infogroup.

30.    On or about March 19, 2012, the parties settled the 2011 Litigation with a settlement agreement containing no release, but restricting the parties' behavior going forward (the "2012 Settlement Agreement") and an agreement to dismiss with prejudice the 2011 Litigation.

31.    Thereafter, Gupta and Debtor violated Infogroup's legal and contractual rights in the way they managed and controlled Debtor.

32.    On or about February 12, 2014, Infogroup filed a second lawsuit against Debtor, and this time Gupta as well, in the U.S. District Court of Nebraska, Case No. 8:14-cv-49 (the "Nebraska Litigation") alleging claims based on Gupta's breach of the Separation Agreement and Debtor and Gupta's unfair business practices, including (i) their efforts to intentionally confuse customers with confusing messages containing improper use of Infogroup's marks designed to lead Infogroup customers to believe Debtor and Infogroup were the same company and (ii) infringement of Infogroup's registered copyright in its business database.

33.    As a result of Gupta's violation of his personal legal and contractual obligations, the U.S. District Court of Nebraska entered judgment on August 29, 2018 in the amount of Ten Million

Dollars ($10,000,000.00) against Gupta for breach of his Separation Agreement with Infogroup after a seven-day jury trial in the Nebraska Litigation.

34.     Evidence at trial in the Nebraska Litigation revealed the Debtor misused Infogroup's marks in violation of the Lanham Act and its contractual obligations not to use Infogroup's marks as set forth in the 2012 Settlement Agreement.

35.     The U.S. District Court of Nebraska also found that Gupta's and Debtor's misuse of Infogroup's marks was both willful and deliberate and (i) awarded Infogroup its attorney fees for its claims under the Lanham Act against Debtor and Gupta and (ii) issued a permanent injunction prohibiting both Debtor and Gupta from using Infogroup's marks.

36.     The U.S. District Court of Nebraska entered an initial judgment against Debtor in the amount of Forty-Three Million Six-Hundred Thousand Dollars ($43,600,000.00) based on the jury's verdict, which the court later reduced after post-trial motions to Eleven Million Two-Hundred Thousand Dollars ($11,200,000.00) plus costs and the above-described injunctive relief and attorney fees (the "Judgment").

37.     Debtor and Gupta appealed the judgments to the Eighth Circuit Court of Appeals.

38.     Neither Debtor nor Gupta appealed the permanent injunction or the award of attorney fees.

39.     Gupta posted a supersedeas letter of credit to stay execution of the judgment against him in his personal capacity.

40.     Debtor filed for bankruptcy in lieu of filing a supersedeas bond to stay execution of the Judgment.

41.    The $11,200,000.00 portion of the Judgment is based on Debtor's infringement of Infogroup's copyright in its business database.

42.    Allegations that Debtor's business database (the "Business Database") infringed Infogroup's business database constituted significant portions of Infogroup's claims against Debtor as set forth in its February 2014 Complaint.

43.    Even in light of the significance of Infogroup's claims of copyright infringement against Debtor, Debtor and Gupta failed to preserve (and actually destroyed) the relevant, infringing copies of its Business Database after the Nebraska Lawsuit was filed.

44.    Debtor and Gupta's destruction of evidence prevented Infogroup from performing a side-by-side comparison of the Infogroup's business database and Debtor's Business Database in order to establish its claim for copyright infringement.

45.    Debtor and Gupta's destruction of the relevant versions of the Business Database resulted in significant sanctions against Debtor, based on the following finding by U.S. Magistrate Judge Susan Bazis:

>    "the Court concludes that Defendants, acting in bad faith, intentionally and with
>    a desire to suppress the truth, destroyed evidence. In doing so, Defendants
>    prejudiced Infogroup."

Nebraska Litigation, Filing No. 343 at ECF p. 5, dated June 5, 2018.

46.    Debtor objected to the U.S. Magistrate's ruling, but the the District Court overruled that objection: "Having thoroughly reviewed the record, the Court finds that the Magistrate Judge's order was neither clearly erroneous nor contrary to law." Nebraska Litigation, Filing No. 400 at ECF p. 2, dated July 5, 2018.

8

47.    Over the course of approximately *4.5 years*, Debtor defended costly litigation through a seven day jury trial without *ever* raising its lack of ownership or control over the subject business database as a defense.

48.    Debtor filed pleadings and offered testimony throughout discovery and at trial consistent with its ownership and control of its Business Database.

49.    On May 7, 2014 and again on June 16, 2014, Debtor offered declarations of Gupta in support of its resistance to Infogroup's Motion for Preliminary Injunction ("Gupta PI Declarations").

50.    Gupta offered statements under the penalty of perjury in the Gupta PI Declarations which contain admissions that Debtor owns and controls the Business Database. (Nebraska Litigation, Filing No. 33-2; Filing No. 48-1).

51.    On May 13, 2014, Gupta testified under oath that Debtor maintains the Business Database. (5/13/14 Gupta Deposition 13:5-25).

52.    The US District Court of Nebraska entered an order denying Infogroup's Motion for Preliminary Injunction, at least in part based on the statements by Gupta under oath and penalty of perjury.

53.    On March 20, 2017, Debtor filed counterclaims in response to Infogroup's Third Amended Complaint in the Nebraska Litigation, which pleading contained the following allegations relating to its ownership, maintenance, and control of the Business Database:

> 224. Database currently employs fifty or fewer persons, buys lists of data from vendors, obtains the rights to reformat, re-configure for receptivity to search queries and user access, and use its proprietary models to make unique lists highly valuable to its customers. . . . .
>
> * * *

226. More detail is set forth here about public aspects of Database's business plan as developed by its management group' this information sharpens the distinctions between Database and Infogroup. Certain parts of Database's business plan are highly confidential and carefully protected. Other parts are publicly known or discernible. Under disclosed parts of its business plan, Database plans do, and does:

> 226.1.    Purchase    commercially-available    electronically-accessible reorganizationable, and manipulable lists of data concerning individual businesses and individuals. . . .

> 226.2. Develop highly sophisticated proprietary models which are made more valuable when used to enhance ubiquitous data and data sources, to make them sorted, or sortable, and thereby useful to subsequent purchasers of the data. Accordingly, Database enhances the data it offers to meet the needs and interests of its target customers, including small customers who seek ways to cope with economic slow-down while being effective at sales.

> 226.3. Price, and offer, its goods and services at prices within the reach of its target customers, and well below those required to absorb the costs of costly, now outdated, compilation activities like those in which Infogroup is engaged.

> * * *

> 226.8. Avoid data compilation or product manufacturing except with unique, value creating and low cost solutions, and generally function in a manner more akin to the traditional work of a wholesale distribution company that buys products from manufacturers, enhances them with proprietary models such as business    credit    capacity,    technology    spending,    rent    expense, telecommunications spending, and expenses for legal costs, insurance, and other matters which may become burdensome with different business models. . . .

> * * *

> 227. . . . Database develops proprietary algorithms used with its software and purchased software data entries to assist its sales personnel and small customer target market. It also adds these algorithms to its goods to advance its merchandising plan. Database's plan is to market its goods and services, and sell software and service, to secondary customers.

(Nebraska Litigation, Filing No. 231 at ECF p. 27 ¶¶ 224-27).

54.    On or about September 14, 2017, Gupta appeared as the designee for a Fed. R. Civ. P. 30(b)(6) deposition, which notice of deposition provided:

In order to resolve issues of fact related to each side's databases, which issues of fact underlie certain discovery disputes, [Plaintiff Infogroup] and Defendant [Debtor] each agreed to designate one of their database technology managers with the most knowledge about the parties' databases to participate in a joint and simultaneous deposition.

(the "Technical Deposition").

55.     The parties agreed to conduct the Technical Deposition, as a step toward retaining a third party expert to perform a side-by-side comparison of Infogroup's business database and Debtor's Business Database in relation to Infogroup's claim for copyright infringement—the parties wanted to ensure that each had an understanding of the language the other party used to discuss certain important components of the Business Database.

56.     Infogroup learned that Debtor destroyed the relevant versions of its Business Database during the Technical Deposition.

57.     During the Technical Deposition, Gupta testified under oath as follows:

**Q.** And, Mr. Gupta, I understand — What is your title with DatabaseUSA?

**A.** I'm CEO.

**Q.**   Mr. Gupta, would you describe generally what the process is that DatabaseUSA uses to either compile or aggregate its database?

**A.** Which database? We've got so many.

**Q.** I want to talk about the database that is the origin of all of the other databases. And it's my understanding from your prior deposition testimony that you have one database, and then from that, you pull subdatabases. Am I correct or not?

**A.** No. We have a consumer database, we have business database, we have a database of new businesses, new homeowners, new movers, you know, nurses, doctors, lawyers. We got a lot of databases.

(Technical Deposition 7:8-23)

58.     Gupta's testimony in the Technical Deposition spanned multiple topics including Debtor's sources of data used to compile its Business Database, Debtor's verification processes, the models used to predict certain business information within the Business Database, Debtor's treatment of obsolete data, and Debtor's process for updating the data in its Business Database.

59.     Gupta testified under oath that that ***Debtor*** purchases many of the sources used to compile the Business Database. (Technical Deposition 11:23-25)

60.     Gupta testified under oath that ***Debtor*** compiles the Business Database:

> **Q.** Okay. So is that process that you described of what DatabaseUSA is doing today to aggregate and compile its business database, is that the same process that DatabaseUSA was using back at the time the lawsuit was filed in 2014?
>
> **A.** Yeah, same thing.

(Technical Deposition 12:9-14)

61.     Gupta testified under oath that ***Debtor*** updates the Business Database:

> **Q.** So how does DatabaseUSA update its current database?
>
>     Debtor's Attorney: Business.
>
> **Q.** I'm sorry, its current business database.
>
> **A.** Yeah, I just explained to you, like we are getting new records from the phone companies all the time. They are providing us new businesses; they are providing us businesses which have gone out of business. We are getting directories all the time; we are using the data to update the database. We are making phone calls; we are going to their Web sites. So that's a never-ending process.

(Technical Deposition 15:6-17).

62.     Gupta testified under oath about Debtor's use (or lack thereof) of a "source hierarchy" to update ***Debtor's*** Business Database:

**Q.** But if you have, again, if you have thousands of sources of information, how do you decide which ones are accurate, or which one of the thousands is accurate and that's the one that will be used over the other sources?

**A.** I don't know. I mean, you're asking a stupid question here. We just don't go by that. If you have a record and then we use a chain store guide, okay, so we go to the record and if we have something there and the chain store guide has something different, we just change it. And then if you make a phone call to the record and then they give us something different, we just change it. Okay? And then we make a phone call later on, find out if they're out of business, disconnected, we just take it out. So I don't know what your line of questioning is, but it just doesn't make sense to me now.

(Technical Deposition 22:23-23:12).

63.     Gupta unequivocally testified under oath, as Debtor's CEO and corporate designee that *Debtor* possessed and maintained the Business Database and was responsible for distributing copies of the Business Database to its related sales companies:

**Q.** So back on the record, we're now on Topic 2, and topic I'd like to address, Mr. Gupta, is preservation and backups, generally. So I want to start with, do you make a distinction between the operational business database and the production database at DatabaseUSA?

**A.** Well, we have a database where we are working with it, and then every month we provide that database to our, you know, sales companies.

**Q.** So what do you call the database that you're working on?

**A.** Just working database.

(Technical Deposition 47:3-12).

64.     During trial in the Nebraska Litigation on August 16, 2018, Mark Richard, Debtor's President, testified at length about how Debtor maintains its business database, including the sources of data in Debtor's database and the various processes used to update and verify the business database, including without limitation (Trial Transcript Vol. IV 755:2-762:8; 773:17-778:1)

13

65.     During trial in the Nebraska Litigation on August 17, 2018, Monica Messer, one of Debtor's three founding members and purported 4.5% owner of Debtor, testified under oath as follows on direct examination by Debtor's attorney (Trial Transcript Vol. V 1041:3-11):

> **Q.** Okay. So now in November of 2011, would you have been the person responsible generally for the compilation of the business database at DatabaseUSA?
>
> **A.** Yes, I would have.
>
> **Q.** Did you steal [Infogroup's] database?
>
> **A.** No, I did not.
>
> **Q.** Did anyone else at your direction or with your permission steal [Infogroup's] database?
>
> **A.** No, we did not.

66.     On or about September 10, 2018, Debtor filed a Motion to Stay Enforcement of Judgment in the Nebraska Litigation during post-trial motions, and in support thereof offered a declaration of Fred Vakili, Debtor's CEO, offering the following regarding in support of its motion:

> While we hope that the company will be profitable in the next few years, to date, DatabaseUSA has lost money every year and has yet to be profitable. DatabaseUSA has incurred millions of dollars in debt as it has worked to build its business and compile its database.

(Nebraska Litigation, Filing No. 485-2 at ECF p. 1 ¶ 5).

67.     The US District Court of Nebraska granted Debtor's Motion to Stay Enforcement of Judgment, based at least in part on the declaration of Mr. Vakili. (Nebraska Litigation, Filing No. 491).

68.     On February 7, 2019, Mr. Vakili testified for part of Debtor's § 341 meeting that Debtor owned its Business Database.

69.     Debtor now claims that ResearchUSA owns the Business Database.

70.     Debtor wholly owned ResearchUSA at the time the Nebraska Litigation commenced.

71.     Debtor now claims it purportedly transferred its interest in ResearchUSA during the course of the Nebraska Litigation.

### *Gupta's Dominance and Control*

72.     Gupta has a substantial ownership interest in Everest, which entity owns at least 90% of Debtor as set forth in Debtor's schedules. (Filing No. 17 at ECF p. 35 ¶ 28).

73.     Debtor's 2018 tax return indicates that Everest owns ███ of Debtor.

74.     On August 16, 2018, Mr. Richard testified during trial in the Nebraska Litigation that Everest is one of Gupta's companies.

75.     Debtor's 2018 tax returns indicate that ████████████████████████████ ██████████████████████████████████.

76.     Everest   is   Gupta's   "Single   Family   Office"   as   described   on   its   website: http://www.everestusa.net/team.

77.     At all relevant times hereto, Gupta has controlled and continues to control Debtor.

78.     On August 16, 2018, Mr. Richard testified at trial that Mr. Gupta is chairman of Debtor's Board of Directors.

79.     Gupta is known to all or nearly all with whom he regularly engages as a dominating force.

80.     At trial of the the Nebraska Litigation Mr. Richard, testified that he does not have overall authority over Debtor as President and that the person with overall power is Gupta.

81.     Gupta micro-manages all aspects of Debtor and ResearchUSA, and no decisions are made in any of the businesses that he owns and controls (including Everest, Debtor, and Research USA) without his approval.

15

82.    Debtor's form expense reports contain the following three questions:

a.    ████████████████████████

b.    ████████████████████████████

c.    ██████████████████████████

83.    Under the direction of Gupta and Everest, Debtor has prosecuted the underlying Chapter 11 case for the primary benefit of Everest and Gupta:

a.    Debtor has identified Everest's claims as fully secured and unassailable, despite the avoidability of Everest's liens as described herein; and

b.    Debtor's Omaha attorneys prepared Loan Documents during the Preference Period (defined below), which endeavored to *post hoc* correct deficiencies in Everest's lien claims, and such attorneys acted, upon information and belief, at the direction of Debtor to conceal such activities despite a pending subpoena for many months.

**COUNT I**
**AVOIDANCE AND RECOVERY OF PREFERENTIAL TRANSFERS**
**(Against Everest)**

84.    Infogroup incorporates the allegations in the foregoing paragraphs by reference as if fully set forth herein.

85.    On the Petition Date and at all material times prior thereto, Everest was Debtor's controlling shareholder, as its (at least) 90.13% owner and was a purported creditor of the Debtor.

86.    Everest is an "affiliate" of Debtor as defined in 11 U.S.C. §101(2), because Everest directly or indirectly owns, controls, and/or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor.

87.    Everest is an "insider" as defined in 11 U.S.C. §101(31)(E), because it is an affiliate.

16

88.    The one year insider preference period under 11 U.S.C. § 547(b)(4)(B) began on January 1, 2018 and ran up to the Petition Date (collectively, the "Preference Period").

89.    Prior to the Petition Date, Everest transacted business with the Debtor, on account of which Debtor was purportedly indebted to Everest.

90.    Debtor entered into multiple pre-Preference Period loan agreements with Everest, including as follows (collectively, the "Initial Loan Documents"):

    a.    Second Amended and Restated Demand Revolving Promissory Note, dated June 4, 2012;

    b.    Affiliates Guaranty and Security Agreement, dated April 18, 2013; and

    c.    Demand Revolving Promissory Note and Security Agreement, dated in January 2017.

91.    The collateral description contained in the Initial Loan Documents is as follows:

> "any and all assets of [Debtor] of whatever type and nature, tangible or intangible, wherever located, whether now owned or hereafter acquired, together with the proceeds thereof and accessions or additions thereto."

92.    The collateral description contained in the Initial Loan Documents is defective, under the requirements of Nevada Revised Statutes § 104.9108, and did not create a security interest for Everest in any of Debtor's assets.

93.    During the Preference Period, Debtor executed amended and restated loan documents including those listed below (collectively, the "Amended Loan Documents"):

    a.    First Amendment to the Second Amended and Restated Demand Revolving Promissory Note and Security Agreement, effective June 5, 2012;

b.      First Amendment of Affiliates Guaranty and Security Agreement, effective April 19, 2013; and

c.      First Amendment to the Demand Revolving Promissory Note and Security Agreement, effective February 1, 2017.

94.      As demonstrated in the table below, the Amended Loan Documents were drafted with effective dates falling the day after the initial loan documents were executed:

| Initial Loan Document | Agreement Date | Amended Loan Document | Effective Date |
|---|---|---|---|
| Second Amended and Restated Demand Revolving Promissory Note | June 4, 2012 | First Amendment to the Second Amended and Restated Demand Revolving Promissory Note and Security Agreement | June 5, 2012 |
| Affiliates Guaranty and Security Agreement | April 18, 2013 | First Amendment of Affiliates Guaranty and Security Agreement | April 19, 2013 |
| Demand Revolving Promissory Note and Security Agreement | January 2017  *no day specified | First Amendment to the Demand Revolving Promissory Note and Security Agreement | February 1, 2017 |

95.      Gupta signed as "Manager" on behalf of Debtor in each of the Initial Loan Documents, which were signed by Debtor only.

96.      Gupta signed as "Manager" on behalf of all party entities, including both Everest and Debtor in each of the backdated[1] Amended Loan Documents.

97.      The backdated Amended Loan Documents contained a revised and detailed collateral description:

---

[1] The Amended Loan Documents are backdated insofar as they do not reflect the actual date of execution, which occurred during the preference period. Instead, Debtor attempted to benefit Everest by providing for an effective date years earlier without disclosing the actual date of signing. Infogroup's use of "backdated" in this complaint is based on this understanding.

18

> "any and all now owned and hereafter acquired or arising, and wherever located, machinery, equipment, furniture, fixtures, general Intangibles, instruments (including promissory notes), documents . . . ." (the "Revised Collateral Description")

98.    The execution of the backdated Amended Loan Documents with the Revised Collateral Description in the constitutes a transfer of an interest of Debtor in property (the "Transfer").

99.    The Revised Collateral Descriptions were used in the backdated Amended Loan Documents for the benefit of Everest, an unsecured creditor of Debtor, at the time such Transfer was made.

100.    The Revised Collateral Descriptions provided or were intended to provide an interest in collateral for or on account of an antecedent debt owed by Debtor before such Transfer was made.

101.    The backdated Amended Loan Documents were executed while Debtor was insolvent.

102.    Debtor's Bankruptcy Schedules reveal, as of the Petition Date, that Debtor had total debts of $45,787,371.05 and total asset values of $25,181,913.23 (Filing No. 17 at ECF p. 4)—and $22,750,000 of such total asset values consists of a highly speculative and disputed claim that is being litigated in the U.S. District Court for the District of Nebraska (Filing No. 17 at ECF p. 12);

103.    The annual Review Report from Debtor's accountant, for the year-end December 31, 2017, shows ██████████████ and ██████████████.

104.    The annual Review Report from Debtor's independent, Omaha-based accounting firm, for the year-end, December 31, 2018, shows ██████████████ and ██████████████ ████████████████████, which the 2018 year-end report describes like this:

██████████████████████████████████████

105.    Debtor's independent, Omaha-based accounting firm repeatedly made note of Debtor's

 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ :

    a.    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

    b.    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

    c.    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

    d.    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

106.    The Transfer enabled Everest to receive more than it would have received

    a.    if the bankruptcy case were a Chapter 7 case;

    b.    if Amended Loan Documents had not been executed; and

    c.    Everest instead received payment to the extent allowed under the Bankruptcy Code.

107.    Based on the foregoing, the Infogroup is entitled to avoid the Transfer made by the Revised Collateral Description in the backdated Amended Loan Documents pursuant to § 547 of the Bankruptcy Code.

108.    Everest is the initial beneficiary of the Transfer, the entity for whose benefit the Transfer was made, or the immediate or mediate transferees of the initial transferee receiving such Transfer.

WHEREFORE, Infogroup respectfully requests the entry of a judgment against Everest on its claims for avoidance of the Transfer under 11 U.S.C. § 547 and awarding the following:

a.    A declaration that the collateral descriptions, in Everest's loan documents existing prior to the execution and delivery of the Amended Loan Documents, are insufficient to create a security interest in any of Debtor's assets;

b.    A judgment in favor of the Estate avoiding all pre-petition security interests claimed by Everest in any of Debtor's assets, pursuant to 11 U.S.C. §§ 547(b), 550(a), together with the costs and expenses of this action including, without limitation, attorneys' fees; and

c.    Such other and further relief as this Court may deem just and proper.

**COUNT II**
**AVOIDANCE AND RECOVERY OF FRAUDULENT TRANSFERS**
**PURSUANT TO 11 U.S.C. § 544 and NEV. REV. STAT. § 112.190**
**(Against Everest)**

109.    Infogroup incorporates the allegations in the foregoing paragraphs by reference as if fully set forth herein.

110.    The Transfer constitutes a "transfer" by the Debtor within the meaning of Nev. Rev. Stat. §§ 112.190 and 112.150(12), including because the Revised Collateral Descriptions in the backdated Amended Loan Documents purportedly resulted in the "creation of a lien or other encumbrance."

111.    Infogroup's claim against Debtor arose before the Transfer was made.

21

112.    Infogroup's claim against Debtor arose at least as early as June 2013, when Infogroup discovered evidence of Debtor's copyright infringement.

113.    Debtor made the Transfer to Everest, which is an insider pursuant to Nev. Rev. Stat. § 112.150(7)(d), because Everest is an affiliate under to Nev. Rev. Stat. § 112.150(1)(a).

114.    Revised Collateral Descriptions provided or intended to provide collateral for or on account of an antecedent debt owed by Debtor before such Transfer was made.

115.    The Debtor was insolvent at the time of the Transfer as set forth in detail above.

116.    Everest had reasonable cause to believe Debtor was insolvent at the time of the Transfer, because Everest had an approximately 90% ownership interest in Debtor and held all or nearly all of Debtor's commercial debt.

117.    Everest had reasonable cause to believe Debtor was insolvent at the time of the Transfer, because Gupta was in control of both Debtor and Everest and his knowledge regarding Debtor's insolvency is imputed to Everest.

WHEREFORE, Infogroup respectfully requests the entry of a judgment against Everest on its claims for avoidance of the Transfer under 11 U.S.C. §§ 544, 550 and Nev. Rev. Stat. § 112.190 and awarding the following:

a.    A declaration that the collateral descriptions, in Everest's loan documents existing prior to the execution and delivery of the Amended Loan Documents, are insufficient to create a security interest in any of Debtor's assets;

b.    A judgment in favor of the Estate avoiding all pre-petition security interests claimed by Everest in any of Debtor's assets, pursuant to Nev. Rev. Stat. § 112.190,

22

together with the costs and expenses of this action including, without limitation, attorneys' fees; and

c.      Such other and further relief as this Court may deem just and proper.

## COUNT III
**ACTUAL FRAUD AND CONSTRUCTIVE FRAUDULENT TRANSFER CLAIM PURSUANT TO 11 U.S.C. § 544 and NEV. REV. STAT. § 112.180 (Against Everest, Fred Vakili, Vijay Malik, Rakesh Gupta, and Agarwal Data Companies)**

118.    Infogroup incorporates the allegations in the foregoing paragraphs by reference as if fully set forth herein.

119.    Debtor came into existence as an entity under Nevada law on October 26, 2009.

120.    In or around 2011, Debtor began licensing business data to customers from its Business Database.

121.    Debtor maintained that it owned and controlled the Business Database throughout the course of the Nebraska Litigation and even during the § 341 meeting on February 7, 2019.

122.    Debtor now alleges the Business Database is owned and controlled by ResearchUSA.

123.    During the § 341 meeting Fred Vakili, Debtor's CEO, initially testified to Debtor's ownership of the Business Database, but later questioned whether perhaps the Business Database was owned by ResearchUSA.

124.    The Business Database, and by extension (based on Debtor's current allegations regarding ownership of the Business Database) Debtor's interest in ResearchUSA, has significant value as evidenced by Debtor's ability to generate millions of dollars income from licensing its contents.

125.    As the CEO of Debtor and ▮▮▮▮▮▮▮▮▮▮, Mr. Vakili should have an accurate understanding of which entity owns such a high value asset. Mr. Vakili's confusion is strong evidence of the farce that is the separate identities of Debtor and ResearchUSA.

126.    On January 22, 2020, Debtor unequivocally declared that ResearchUSA owns Debtor's Business Database for the first time. (Debtor's Reply in Support of its Disclosure, Filing No. 244 at ECF p. 6 ¶ 2).

127.    At the § 341 meeting, Mr. Vakili testified under oath that the fair value of all Debtor's assets was at least $34 million. It is believed that this estimation was based on an underlying assumption that Debtor owns the Business Database.

128.    Debtor's schedules represent that its voluntary debts total $34,587,371 (excluding Infogroup's Judgment claim) and its operating assets have a total value of $2,431,913 (excluding a disputed claim in litigation).

129.    The vast disparity between Mr. Vakili's estimation of the value of Debtor's assets ($34MM) and the actual value of those assets represented in Debtor's bankruptcy schedules ($2.4MM) is inconsistent with Debtor's full disclosure obligations in bankruptcy.

130.    On or about February 12, 2014, Infogroup filed a forty-two page complaint (plus exhibits) (the "February 2014 Complaint") against Debtor and Gupta with sixteen causes of action in the US District Court of Nebraska, Case No. 8:14-cv-49 (the "Nebraska Litigation"), which included claims for misappropriation of trade secrets, deceptive trade practices, computer fraud and abuse, false advertising, trademark infringement, unfair competition, copyright infringement, breach of contract, tortious interference, unjust enrichment, and civil conspiracy.

131.   Of particular importance, the February 2014 Complaint contained claims seeking to hold Debtor liable for its unlawful infringement of Infogroup's business database.

132.   On or about February 26, 2014, Infogroup filed a Motion for Preliminary Injunction against Gupta and Debtor seeking to enjoin Debtor from the following behavior:

a.     Using, disclosing, or misappropriating Infogroup's trade secrets or other confidential information including, without limitation, Infogroup's proprietary databases;

b.     Making false or deceptive statements of fact regarding DB101's services including, without limitation, that listings in DB101's databases have been "verified";

c.     Referencing or using any of Infogroup's registered or unregistered trademarks (including, without limitation, INFOGROUP, INFOUSA, SALESGENIE, REFERENCE USA or any other trademarks, service marks, company names, or trade names currently or formerly in use by Infogroup or any of its subsidiaries) in commerce including, without limitation, use on its websites "Infofree.com," "DatabaseUSA.com," "AtoZDatabases.com," or "Creditjam.com"; and

d.     Making any claim that suggests the existence of any present relationship or association between itself or its founder(s), subsidiaries, affiliates, employees, owners, or agents and Infogroup, its subsidiaries or their products and services.

133.   The motion for preliminary injunction was hotly contested and the parties conducted extensive discovery relating to Infogroup's motion for preliminary injunction between February 2014 and March 2015, when the District Court entered its order denying Infogroup's Motion for Preliminary Injunction.

134.    ResearchUSA ███████████████████████████ from ResearchUSA's inception, including at the time Infogroup filed is February 2014 Complaint.

135.    On or about January 1, 2015, Debtor purportedly transferred all of its interest in ResearchUSA.

136.    At the time Debtor purportedly transferred its interest in ResearchUSA, Infogroup's Motion for Preliminary Injunction was still pending.

137.    At the time Debtor purportedly transferred its interest in ResearchUSA, the Nebraska Litigation was active and in its beginning stages.

138.    Put another way, Debtor claims that it transferred its ownership interest in the very Business Database that Infogroup alleged was a copy of its business database **while the parties litigated Infogroup's claim for copyright infringement.**

139.    Debtor never informed Infogroup that it had purportedly transferred its interest in ResearchUSA or the Business Database.

140.    Debtor asserted ownership and defended actions relating to the copyright infringement by the Business Database for over three years after it purportedly transferred its interest in ResearchUSA.

141.    The Nebraska Litigation did not go to trial until August 13, 2018.

142.    During pretrial motions, the seven-day jury trial, and post-trial motions in the Nebraska Litigation, Debtor continuously made arguments to the Court and submitted evidence with the underlying representation that Debtor was the owner of the Business Database.

143.    On or about January 1, 2015, Debtor purportedly transferred some or all of its interest in ResearchUSA to ████.

144.    Upon information and belief, on or about January 1, 2015, Debtor purportedly transferred some or all of its interest in ResearchUSA to ██████████, either directly or indirectly.

145.    Upon information and belief, on or about January 1, 2015, Debtor purportedly transferred some or all of its interest in ResearchUSA to ██████████, either directly or indirectly.

146.    Upon information and belief, on or about January 1, 2015, Debtor purportedly transferred some or all of its interest in ResearchUSA to ██████████, either directly or indirectly.

147.    Upon information and belief, in 2016, ██████████ purportedly transferred some or all of his interest in ResearchUSA to ██████████, either directly or indirectly.

148.    Upon information and belief, including without limitation Debtor's failure to disclose the purported transfer of its interest in ResearchUSA despite threatened and actual liability stemming from its ownership of the Business Database, Debtor purportedly transferred its interest in ResearchUSA with actual intent to hinder, delay or defraud Infogroup, a creditor of Debtor.

149.    Debtor's purported transfer of its interest in ResearchUSA bears multiple badges of fraud identified in Nev. Rev. Stat. § 112.180(2), including as follows:

   a.    Debtor's purported transfer of its interest in ResearchUSA was to an insider or insiders with the the meaning of Nev. Rev. Stat. § 112.150(7)(d);

   b.    The Debtor retained possession or control of the Business Database and/or ResearchUSA after the purported transfer, which is ██████████████████ ██████████.

   c.    Debtor's purported transfer of ResearchUSA resulted in removal and/or funneling of Debtor's revenue to an outside entity owned by ██████, rather than Debtor's retention of such revenue to Debtor's detriment;

d.    Debtor concealed its purported transfer of ResearchUSA from Infogroup, the U.S. District Court of Nebraska, and the jury in the Nebraska Litigation;

e.    Debtor concealed its purported transfer of ResearchUSA in its Statement of Financial Affairs until it filed amendments thereto more than a year after the Petition Date (Filing No. Filing No. 251 at ECF p. 9 ¶ 25.1);

f.    The Nebraska Litigation, which ultimately resulted in a multi-million dollar judgment, a permanent injunction, and an award of hundreds of thousands of dollars in attorney fees, was ongoing when Debtor made the purported transfer;

g.    The purported transfer was of substantially all Debtor's assets;

h.    The value of the consideration received by Debtor has not been disclosed in Debtor's bankruptcy proceedings by Debtor or Everest in defiance of pending subpoenas;

i.    Debtor was insolvent when it purportedly transferred its interest in ResearchUSA (as discussed above); and

j.    The purported transfer occurred shortly before or after a substantial debt was incurred (Debtor's total liabilities increased by ████████████████ during the 12 month period during which the alleged transfer took place).

150.    The purported transfer of Debtor's 100% ownership interest in ResearchUSA is avoidable under Nevada's Uniform Fraudulent Transfer Act for "actual intent to hinder, delay or defraud any creditor of the debtor" (NRS § 112.180(1)(a)) and 11 U.S.C. §§ 544 & 550(a).

151.    Upon information and belief, Debtor received no or inadequate consideration in exchange for its interest in ResearchUSA based on (i) Debtor's refusal to produce any documentation

28

to establish the consideration for the purported transfer in violation of a subpoena and (ii) the ████

██████████████████ in Debtor's financial records.

152.    As described in more detail below, Gupta and Everest intentionally maintained Debtor in a state of insolvency and directed fraudulent transfers.

153.    Debtor was engaged in a business for which its remaining assets were unreasonably small in relation to the business, as evidenced by the enormous debt taken on by Debtor pursuant to the Initial Loan Documents and the purported transfer of its ownership interest in ResearchUSA after the commencement of litigation.

154.    Debtor intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due as evidenced by the enormous debt taken on by Debtor pursuant to the Initial Loan Documents and the purported transfer of its ownership interest in ResearchUSA after the commencement of litigation.

155.    The purported transfer of Debtor's 100% ownership interest in Research USA is avoidable under Nevada's Uniform Fraudulent Transfer Act for "lack of reasonably equivalent value in exchange" (NRS § 112.180(1)(b)) and 11 U.S.C. §§ 544 & 550(a).

WHEREFORE, Infogroup respectfully requests the entry of a judgment as follows:

a.    A judgment in favor of the Estate and against ████, ██████, ██████,

██████, and ████████████, jointly and severally, avoiding the transfer of Debtor's 100% ownership interests in Research USA, LLC, to them, or awarding the value thereof, pursuant to 11 U.S.C. §§ 544, 550(a) and Nevada Revised Statutes § 112.180, together with the costs and expenses of this action including, without limitation, attorneys' fees; and

b.      Such other and further relief as this Court may deem just and proper.

## COUNT IV
## EQUITABLE SUBORDINATION
### (Against Everest)

156.    Infogroup incorporates the allegations in the foregoing paragraphs by reference as if fully set forth herein.

157.    Behaviors by Everest throughout its dealings with Infogroup and the positions taken by Everest and Debtor in this case are replete with fraud, inequity and unfairness.

158.    Everest executed the backdated Amended Loan Documents within the Preference Period in an attempt to secure claims that were otherwise unsecured.

159.    Everest, with the assistance of Debtor, attempted to conceal the fact that the backdated Amended Loan Documents were executed within the Preference Period, including by instructing its attorneys to delay and not produce documents pursuant to a pending subpoena.

160.    The backdated Amended Loan Documents caused harm to Infogroup insofar as they purportedly granted Everest's interest in the Estate priority over that of Infogroup.

161.    Everest has used and continues to use the notion of Everest and Debtor as separate corporate entities to perpetrate fraud and promote a manifest injustices, including without limitation:

a.      Everest's use of Debtor to hold all or nearly all debt associated with licensing the Business Database purportedly held by ResearchUSA such that

(i)      Debtor finances its operations through Everest,

(ii)     Debtor pays to ResearchUSA much of Debtor's revenue plus financed operational money Debtor received from Everest, purportedly for use of the Business Database,

(iii)    Upon information and belief, Debtor transferred its 100% interest in ResearchUSA to ██████████████ for no or grossly inadequate consideration, and

(iv)    Debtor has been maintained as an insolvent entity for an improper purpose.

b.    Debtor, at the direction of Everest, offered testimony throughout the course of the Nebraska Litigation, including at trial, suggesting that it was the owner of the Business Database, thereby concealing the purported true liability of ResearchUSA for Infogroup's claims and facilitating Infogroup's pursuit of a judgment against insolvent Debtor instead.

c.    Before and throughout the course of the Nebraska Litigation, Everest ensured that all of Debtor's creditors were paid in full thereby increasing Debtor's debt to Everest, which course of conduct continued at least until Infogroup obtained the Judgment, which Everest has not satisfied.

162.    Everest's use of Debtor as a debt-holding company and fraudulent testimony in the course of the Nebraska Litigation has harmed Infogroup, because it resulted in Infogroup obtaining a judgment against an insolvent company that Debtor now claims was not the rightfully liable party.

163.    Subordination of Everest's claim is appropriate because (i) there is evidence of fraud, inequity, or unfairness and (ii) Everest's conduct has harmed Debtor and Infogroup.

164.    Subordination of Everest's claim will not operate only to penalize Everest, because the value of Infogroup's claim is equal to the amount of damages that Everest has inflicted by its fraudulent and inequitable conduct.

31

WHEREFORE, Infogroup respectfully requests the entry of a judgment against Everest on its claim for equitable subordination and awarding the following:

      a.     A judgment equitably subordinating all claims of Everest to the claims of Infogroup and of all unsecured claims of other creditors, under 11 U.S.C. § 510(c), together with the costs and expenses of this action including, without limitation, attorneys' fees; and

      b.     Such other and further relief as this Court may deem just and proper.  and awarding the following:

## COUNT V
## ALTER EGO LIABILITY
### (Against Everest)

165.    Infogroup incorporates the allegations in the foregoing paragraphs by reference as if fully set forth herein.

166.    Debtor is influenced and governed by Everest.

167.    There is such unity of interest and ownership between Everest and Debtor that they are inseparable from each other.

168.    Everest has used and continues to use the notion of Everest and Debtor as separate corporate entities to perpetrate fraud and promote a manifest injustices, including without limitation:

      a.     Everest's use of Debtor to hold all or nearly all debt associated with licensing the business database purportedly held by ResearchUSA such that

          (i)     Debtor finances its operations through Everest,

(ii)     Debtor pays to ResearchUSA much of Debtor's revenue plus financed operational money Debtor received from Everest, purportedly for use of the Business Database,

(iii)    Upon information and belief, Debtor purportedly ████████ ████████████████████████████████████████ for no or grossly inadequate consideration, and

(iv)    Debtor has been maintained as an insolvent entity for an improper purpose.

b.     Debtor, at the direction of Everest, offered testimony throughout the course of the Nebraska Litigation, including at trial, suggesting that it was the owner of the Business Database, thereby concealing the true liability of ResearchUSA for Infogroup's claims and facilitating Infogroup's pursuit of a judgment against insolvent Debtor instead.

WHEREFORE, Infogroup respectfully requests the entry of a judgment against Everest on its claim for alter ego liability and awarding the following:

c.     a judgment against Everest for the amount of Infogroup's allowed claim and the allowed claims of all other creditors against Debtor, as Debtor's alter ego; and

d.     Such other and further relief as this Court may deem just and proper.

## COUNT VI
## ALTER EGO LIABILITY
### (Against Gupta)

169.    Infogroup incorporates the allegations in the foregoing paragraphs by reference as if fully set forth herein.

170.    Debtor is influenced and governed by Gupta as described above.

171.    Debtor is influenced and governed by Everest as described above.

172.    Gupta governs and influences Everest as described above.

173.    Debtor is influenced and governed by Gupta through Everest as described above, including without limitation Gupta's total control and micromanagement of Everest, Debtor, and ResearchUSA.

174.    There is such unity of interest and ownership between Everest and Debtor that they are inseparable from each other.

175.    There is such unity of interest and ownership between Gupta and Everest that they are inseparable from each other.

176.    Gupta has used and continues to use the notion of Everest and Debtor as separate corporate entities to perpetrate fraud and promote manifest injustices as described herein.

WHEREFORE, Infogroup respectfully requests the entry of a judgment against Gupta on its claim for alter ego liability and awarding the following:

a.      a judgment against Gupta for the amount of Infogroup's allowed claim and the allowed claims of all other creditors against Debtor, as Debtor's alter ego; and

b.      Such other and further relief as this Court may deem just and proper.

**COUNT VII**
**DECLARATORY JUDGMENT**
**(Against Everest, ResearchUSA, and Gupta)**

177.    Infogroup incorporates the allegations in the foregoing paragraphs by reference as if fully set forth herein.

34

178.    As set forth in detail above Gupta, Vakili, Messer, and Richard gave sworn statements under penalty of perjury in support of Debtor's defenses and counterclaims in the Nebraska Litigation claiming that Debtor owned and controlled the Business Database.

179.    The statements by Gupta, Vakili, Messer, and Richard were made at the direction of Gupta, Everest, and ResearchUSA.

180.    The statements by Gupta, Vakili, Messer, and Richard were for the benefit of ResearchUSA, in that Infogroup's pursuit of copyright infringement liability against Debtor prevented Infogroup from pursuing liability against the company (ResearchUSA) that Debtor now claims actually owns the infringing Business Database.

181.    The statements by Gupta, Vakili, Messer, and Richard were for the benefit of Everest, because Gupta and Everest maintained Debtor as little more than a vehicle for debt, whereas ResearchUSA purportedly owns the Business Database, a valuable asset against which Infogroup would be able to execute a judgment.

182.    Based on statements by Gupta, Vakili, Messer, and Richard, Everest and ResearchUSA were successful in asserting the position that Debtor owned and controlled the Business Database, because Infogroup obtained a judgment against Debtor of copyright infringement based on the Business Database.

183.    Gupta, Vakili, Messer, and Richard made the statements described above intentionally and wrongfully in an effort to induce Infogroup to pursue judgment for copyright infringement against an entity which it now claims does not own the infringing Business Database.

184.    Gupta, Vakili, Messer, and Richard did not make the statements described above as a result of ignorance, fraud, or mistake.

185.    Messer's statements are reasonably imputed to Everest as Everest's "Family Office Executive – Acquisitions" as indicated on Everest's website:

http://www.everestusa.net/team/profile/monica-messer

186.    Vakili's statements are reasonably imputed to ResearchUSA, because he is ████████ ████████████████.

187.    Gupta's statements are reasonably imputed to Everest and ResearchUSA, entities which ██████████████████████████████████████.

188.    The position taken by Debtor, Gupta, Vakili, Messer, and Richard throughout the course of the Nebraska Litigation, that Debtor owns the Business Database, is totally inconsistent with the position that ResearchUSA owns the Business Database.

189.    Gupta is judicially estopped from asserting that person or entity but Debtor owns the Business Database

190.    Everest is judicially estopped from asserting that any person or entity but Debtor owns the Business Database.

191.    ResearchUSA is judicially estopped from asserting that anyone but Debtor owns the Business Database.

192.    As set forth above, an actual, live, and justiciable controversy exists between Infogroup on one hand and Everest, ResearchUSA, Gupta, and Vakili on the other hand concerning, among other things, whether Debtor owns the Business Database.

193.    Because Debtor, Everest, and ResearchUSA are judicially estopped from asserting that any person or entity but Debtor owns the Business Database, there is no interested party with standing to contest Debtor's ownership of the Business Database.

WHEREFORE, Infogroup respectfully requests the entry of a judgment, declaring the following:

  a. Debtor is judicially estopped from asserting that any person or entity but Debtor owns the Business Database;

  b. Everest is judicially estopped from asserting that any person or entity but Debtor owns the Business Database;

  c. ResearchUSA is judicially estopped from asserting that any person or entity but Debtor owns the Business Database; and

  d. Debtor solely and exclusively owns the Business Database.

## COUNT VIII
### IMPROPER DISTRIBUTION OF PROFITS AND CONTRIBUTIONS
### PURSUANT TO 11 U.S.C. § 544 and NEV. REV. STAT. § 86.343
### (Against Everest and ResearchUSA)

194.    Infogroup incorporates the allegations in the foregoing paragraphs by reference as if fully set forth herein.

195.    Debtor owns the Business Database.

196.    Debtor issued payments to ResearchUSA for ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

197.    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, because Debtor—not ResearchUSA—owns the Business Database and as had the right to use the Business Database without licensing fees.

198.    Debtor should have ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ as they were never valid or properly due.

199.    In addition, Debtor should have also collected payments from other affiliated companies using the Business Database, ███████████████████████████████████ ███████████████.

200.    Upon information and belief, ███████████████████████████.

201.    Everest ███████████████████████████ to divert revenue properly earned and attributed to Debtor.

202.    Everest directed the ███████████████ to ResearchUSA to divert revenue properly earned and attributed to Debtor.

203.    Debtor improperly assumed and paid certain expenses, debts, and liabilities that were fraudulently assigned to Debtor, but should have been assigned to ResearchUSA ("ResearchUSA's Expenses").

204.    If Debtor had retained ███████████████ and received ███████████████, Debtor would have been profitable.

205.    If Debtor had not assumed and paid ResearchUSA's Expenses, Debtor would have been profitable.

206.    At the time Debtor issued the ███████████████, such transfers were prohibited by Nev. Rev. Stat. § 86.343(1), because the total assets of the company were less than the sum of the liabilities.

207.    At the time Everest directed payment of the ███████████████ to ResearchUSA, such transfers were prohibited by Nev. Rev. Stat. § 86.343(1), because the total assets of Debtor company were less than the sum of the liabilities.

208.    At the time Debtor issued payments for ResearchUSA's Expenses, such transfers were prohibited by Nev. Rev. Stat. § 86.343(1), because the total assets of the company were less than the sum of the liabilities.

209.    The ████████████ and ████████████ are disguised distributions of profit and contributions to Everest, Debtor's majority member.

210.    The payments for ResearchUSA's Expenses are disguised distributions of profit and contributions to ████████████.

211.    Everest is liable to Debtor in the amount of the ████████████ and ████ ████ pursuant to Nev. Rev. Stat. § 86.343(6).

212.    ResearchUSA is liable to Debtor in the amount of the ████████████ and ████ ████ pursuant to Nev. Rev. Stat. § 86.343(6), as the recipient of such transfers ████████ ████.

213.    Such improper transfers and remittances should be voided and ResearchUSA and Everest should be ordered to return such transfers and remittances to the Estate and repay payments amounts paid by Debtor for ResearchUSA's Expenses.

WHEREFORE, Infogroup respectfully requests the entry of a judgment against Everest and ResearchUSA, jointly and severally, on the claim for Improper Distribution of Profits and Contributions pursuant to Nev. Rev. Stat. § 86.343 and awarding a judgment in favor of the Estate and against Everest and ResearchUSA, jointly and severally, for the ████████ , ████████ ████ , and ResearchUSA's Expenses; and such other and further relief as this Court may deem just and proper.

**COUNT IX**
**AVOIDANCE OF POST-PETITION AFFILIATE PAYMENT**
**PURSUANT TO 11 U.S.C. §§ 549 and 550**
**(Against Red Fox, Everest, and Gupta)**

214.    Infogroup incorporates the allegations in the foregoing paragraphs by reference as if fully set forth herein.

215.    On or about January 30, 2019 (approximately one month after the Petition Date), Debtor issued payment to Red Fox in the amount of One Hundred Eighty Thousand Dollars ($180,000.00) pursuant to an ▮▮▮▮▮▮▮▮▮▮▮▮ (the "Red Fox Payment").

216.    Red Fox ▮▮▮▮▮▮▮▮▮▮▮▮▮▮. A true and correct copy of the relevant invoice ▮▮▮▮▮▮▮ is attached hereto as <u>Exhibit "B"</u> and incorporated herein by reference.

217.    The Red Fox Payment occurred after the Petition Date.

218.    The Red Fox Payment was not authorized under the Bankruptcy Code.

219.    The Red Fox Payment was not authorized by order of the Court.

220.    The Red Fox Payment is subject to avoidance pursuant to 11 U.S.C. § 549(a).

221.    Everest is liable to the Estate for the value of the Red Fox Payment pursuant to 11 U.S.C. § 550, because the Red Fox Payment ▮▮▮▮▮▮▮▮▮▮.

222.    Gupta is liable to the Estate for the value of the Red Fox Payment pursuant to 11 U.S.C. § 550, because the Red Fox Payment ▮▮▮▮▮▮▮▮▮▮.

WHEREFORE, Infogroup respectfully requests the entry of a judgment against Red Fox, Everest, and Gupta, jointly and severally, on the claims for avoidance of the Red Fox Payment under 11 U.S.C. §§ 549 and 550 and awarding the following:

40

a.      A judgment in favor of the Estate in the amount of One Hundred Eighty Thousand Dollars ($180,000.00), together with the costs and expenses of this action including, without limitation, attorneys' fees; and

b.      Such other and further relief as this Court may deem just and proper.

**COUNT X**
**AVOIDANCE OF PREFERENCE PAYMENT**
**PURSUANT TO 11 U.S.C. §§ 547 and 550**
**(Against Robins Kaplan)**

223.    Infogroup incorporates the allegations in the foregoing paragraphs by reference as if fully set forth herein.

224.    Prior to the Petition Date, Debtor transacted business with Robins Kaplan, on account of which Debtor was indebted to Robins Kaplan.

225.    The US District Court of Nebraska entered the initial Judgment against Debtor in the Nebraska Litigation against Debtor on August 31, 2018.

226.    Thereafter, the parties engaged in substantial post-trial motion practice.

227.    Robins Kaplan represented Debtor and Gupta on all post-trial filings.

228.    On October 17, 2018, Robins Kaplan filed its final post-trial briefs.

229.    Debtor filed its Notice of Appeal on December 20, 2018.

230.    Debtor issued checks to Robins Kaplan, which cleared Debtor's bank account during and after the 90-day statutory preference period as follows:

| Check No. | Check Date | Amount | Clear Date |
|-----------|-----------|--------|-----------|
| 1607 | 9/28/18 | $128,030.11 | 10/2/18 |
| 1733 | 10/31/18 | $291,950.84 | 12/4/18 |

41

| 1734 | 10/31/18 | $55,846.20 | 11/20/18 |
| 1732 | 10/31/18 | $143,268.54 | 1/2/19 |
| 1919 | 12/21/18 | $71,915.17 | 1/7/19 |

231. Check No. 1607 cleared Debtor's bank account approximately four days after the date on the check.

232. Notably, Debtor issued three checks to Robins Kaplan dated October 31, 2018, none of which were timely deposited by Robins Kaplan:

    a.    Check No. 1734 cleared Debtor's bank account nearly three weeks after the date on the check;

    b.    Check No. 1733 cleared Debtor's bank account over a month after the date on the check; and

    c.    Check No. 1732 cleared Debtor's bank account over two months after the date on the check.

233. Robins Kaplan repaid amounts received after the Petition Date.

234. Infogroup requested full disclosure of the circumstances surrounding Check Nos. 1733 and 1734 in the related Chapter 11 bankruptcy. (Filing No. 213 at ECF p. 2 ¶ 5).

235. Debtor and Robins Kaplan refused full disclosure. (Filing No. 216 at ECF p. 2).

236. Infogroup has performed all reasonable due diligence in the circumstances as to any defenses to claims of preference that may be raised by Robins Kaplan.

237. Debtor made payments totaling at least $347,797.04 (Checks Nos. 1733 and 1734) during the 90 days preceding the filing of the bankruptcy petition to or for the benefit of Robins Kaplan ("Preference Period Payments"), which are avoidable pursuant to 11 U.S.C. § 547.

238.    Each of the Preference Period Payments constitutes a transfer of an interest of Debtor in property.

239.    The Preference Period Payments were made to or for the benefit of Robins Kaplan, an unsecured creditor of Debtor at the time such transfers were made.

240.    Preference Period Payments were for or on account of an antecedent debt owed by Debtor before such transfers were made.

241.    Each of the Preference Period Payments was made while Debtor was insolvent.

242.    The Preference Period Payments enabled Robins Kaplan to receive more than it would have received:

    a.    if the bankruptcy case were a Chapter 7 case;

    b.    if Preference Period Payments had not been made; and

    c.    Robins Kaplan instead received payment to the extent allowed under the Bankruptcy Code.

243.    Based on the foregoing, Infogroup is entitled to avoid the Preference Period Payments pursuant to § 547 of the Bankruptcy Code.

244.    Robins Kaplan is the initial transferee of the Preference Period Payments, the entity for whose benefit the Preference Period Payments were made, or the immediate or mediate transferees of the initial transferee receiving the Preference Period Payments.

245.    Based on the foregoing, Plaintiff is entitled to recover the value of the Preference Period Payments from Robins Kaplan pursuant to § 550 of the Bankruptcy Code.

246.    Under 11 U.S.C. § 502(d) Robins Kaplan is not entitled to allowance of any claim until the Preference Period Payments are repaid.

WHEREFORE, Infogroup respectfully requests the entry of a judgment against Robins Kaplan on its claims for avoidance of the Preference Period Payments under 11 U.S.C. §§ 547 and 550 and awarding the following:

     a.     A judgment in favor of the Estate avoiding the Preference Period Payments in an amount not less than $347,797.04, together with the costs and expenses of this action including, without limitation, attorneys' fees;

     b.     Enforcement 11 U.S.C. § 502(d) against Robins Kaplan, prohibiting allowance of any claim by Robins Kaplan until the Preference Period Payments have been repaid to the Estate; and

     c.     Such other and further relief as this Court may deem just and proper.

DATED this ____ day of February 2020.

Donald L. Swanson (NE Bar No 16385)
*Admitted Pro Hac Vice 1/10/19*
Koley Jessen P.C., L.L.O.
1125 S. 103rd St., Ste 800
Omaha, NE 68124
Telephone (402) 343-3726
Facsimile (402) 390-9005
Don.swanson@koleyjessen.com

Matthew L. Johnson (6004)
Russell G. Gubler (10889)
Ashveen S. Dhillon (14189)
8831 West Sahara Avenue
Las Vegas, NV 89117
Telephone (702) 388-1996
Facsimile (702) 471-0075
mjohnson@mjohnsonlaw.com

*Attorneys for Infogroup Inc.*

44

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

SECURITIES AND EXCHANGE COMMISSION,

    Plaintiff,

v.

VINOD GUPTA,

    Defendant.

Case No. 8:10CV100

---

## FINAL JUDGMENT AS TO DEFENDANT VINOD GUPTA

---

The Securities and Exchange Commission having filed a Complaint and Defendant

Vinod Gupta having entered a general appearance; consented to the Court's jurisdiction over

Defendant and the subject matter of this action; consented to entry of this Final Judgment

without admitting or denying the allegations of the Complaint (except as to jurisdiction); waived

findings of fact and conclusions of law; and waived any right to appeal from this Final

Judgment:

I.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that Defendant and

Defendant's agents, servants, employees, attorneys, and all persons in active concert or

participation with them who receive actual notice of this Final Judgment by personal service or

otherwise are permanently restrained and enjoined from violating, directly or indirectly, Section

10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78j(b)] and

Rule 10b-5 promulgated thereunder [17 C.F.R. § 240.10b-5], by using any means or

**EXHIBIT A**

instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange, in connection with the purchase or sale of any security:

(a)     to employ any device, scheme, or artifice to defraud;

(b)     to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

(c)     to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

II.

IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant and Defendant's agents, servants, employees, attorneys and all persons in active concert or participation with them who receive actual notice of this Final Judgment by personal service or otherwise are permanently restrained and enjoined from violating, directly or indirectly, Section 14(a) of the Exchange Act [15 U.S.C. §78n(a)] and Rules 14a-3 and 14a-9 promulgated thereunder [17 C.F.R. §§ 240.14a-3 and 14a-9] by soliciting proxies without furnishing each person solicited a proxy statement containing the information specified by the proxy rules or a proxy statement included in a registration statement filed under the Securities Act on Form S-4, Form N-4, or Form N-14 containing the information specified on such Form, and using proxy statements containing statements which, at the time and in light of the circumstances under which they are made, are false or misleading with respect to any material fact, or omit to state material facts necessary to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for

2

the same meeting or subject matter which has become false or misleading.

III.

IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant and Defendant's agents, servants, employees, attorneys, and all persons in active concert or participation with them who receive actual notice of this Final Judgment by personal service or otherwise are permanently restrained and enjoined from violating, directly or indirectly, Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)] and Rule 13b2-1 promulgated thereunder [17 C.F.R. § 240.13b2-1] by:

(a)    falsifying or causing to be falsified any book, record or account subject to Section 13(b)(2)(A) of the Exchange Act; or

(b)    knowingly circumventing or knowingly failing to implement a system of internal accounting controls.

IV.

IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant and Defendant's agents, servants, employees, attorneys, and all persons in active concert or participation with them who receive actual notice of this Final Judgment by personal service or otherwise are permanently restrained and enjoined from violating of Exchange Act Rule 13a-14 [17 C.F.R. § 240.13a-14] by certifying falsely that to the best of their knowledge there were no untrue statements of material fact or omissions of a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading in any report filed under Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)].

3

## V.

IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant and Defendant's agents, servants, employees, attorneys, and all persons in active concert or participation with them who receive actual notice of this Final Judgment by personal service or otherwise are permanently restrained and enjoined from violating, directly or indirectly, Rule 13b2-2 [17 C.F.R. § 240.13b2-2] promulgated under Section 13(b)(2) of the Exchange Act [15 U.S.C. § 78m(b)(2)] by:

    (a) making or causing to be made a materially false or misleading statement to an accountant in connection with any audit, review or examination of financial statements or in the preparation or filing of any document or report required to be filed with the Commission; or

    (b) omitting to state, or causing another person to omit to state, any material fact necessary in order to make statements made, in light of the circumstances under which such statements were made, not misleading, to an accountant in connection with any audit, review or examination of financial statements or in the preparation or filing of any document or report required to be filed with the Commission.

## VI.

IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant and Defendant's agents, servants, employees, attorneys, and all persons in active concert or participation with them who receive actual notice of this Final Judgment by personal service or otherwise are permanently restrained and enjoined from aiding and abetting any violations of Sections 13(a) and 13(b)(2) of the Exchange Act [15 U.S.C. §§ 78m(a), and 78m(b)(2)] and

4

Rules 12b-20, 13a-1, and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1, and 240.13a-13] by knowingly providing substantial assistance to an issuer that:

    (a)    fails to file with the Commission any report or statement required to be filed with the Commission pursuant to Section 13(a) of the Exchange Act and the rules and regulations promulgated thereunder, or information and documents required by the Commission to keep reasonably current the information and documents required to be included in or filed with an application or registration statement filed pursuant to Section 12 of the Exchange Act;

    (b)    fails, in addition to the information expressly required to be included in a statement or report, to add such further material information as is necessary to make the required statements, in the light of the circumstances under which they were made, not misleading;

    (c)    fails to make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of assets of the issuer; or

    (d)    fails to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that: transactions are executed in accordance with management's general or specific authorization; transactions are recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and to maintain accountability for assets; access to assets is permitted only in accordance with management's general or specific authorization; and the

5

recorded accountability for assets is compared with the existing assets at

reasonable intervals and appropriate action is taken with respect to any

differences.

VII.

IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that, pursuant

to Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)], Defendant is prohibited from

acting as an officer or director of any issuer that has a class of securities registered pursuant to

Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to

Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)].

VIII.

IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant

shall pay disgorgement of $4,045,000, representing ill-gotten gains as a result of the conduct

alleged in the Complaint, together with prejudgment interest thereon in the amount of

$1,145,400, for a total of $5,190,400.  Defendant shall satisfy this obligation by paying

$5,190,400 to infoGroup, Inc. ("Info"), c/o John Jesse, Corporate Treasurer, infoGroup, Inc.,

5711 South 86th Circle, Omaha, NE 68127-0347, by certified check, bank cashier's check, or

United States postal money order.  Defendant shall pay to Info $5,190,400 as soon as legally

permissible after a public announcement of any sale of Info, or no more than 45 days after the

sale of Info is completed and consideration from the purchaser is received by shareholders,

whichever occurs first, plus post-judgment interest pursuant to 28 U.S.C. § 1961, but in any

event, Defendant shall pay to Info $5,190,400 no later than 360 days from the date of this Final

Judgment, plus post-judgment interest pursuant to 28 U.S.C. § 1961.  Defendant will include

6

with payment a cover letter identifying Vinod Gupta as a defendant in this action, setting forth the title and civil action number of this action and the name of this Court, and specifying that payment is made pursuant to this Final Judgment. Defendant shall simultaneously transmit photocopies of such payment(s) and letter(s) to the Commission's counsel in this action. By making this payment, Defendant relinquishes all legal and equitable right, title, and interest in such funds, and no part of the funds shall be returned to Defendant. If Defendant fails to make payment by the date agreed and/or in the amount agreed according to the schedule set forth above, all outstanding payments under this Final Judgment, including post-judgment interest, minus any payments made, shall become due and payable immediately without further application to the Court. Defendant shall pay post-judgment interest on any delinquent amounts pursuant to 28 USC § 1961.

IX.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant shall pay a civil penalty in the amount of $2,240,700 pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]. Defendant shall make this payment as soon as legally permissible after a public announcement of any sale of Info, or no more than 45 days after the sale of Info is completed and consideration from the purchaser is received by shareholders, whichever occurs first, plus post-judgment interest pursuant to 28 U.S.C. § 1961, but in any event, Defendant shall pay $2,240,700 no later than 360 days from date of this Final Judgment, plus post-judgment interest pursuant to 28 U.S.C. § 1961. The payment shall be made by certified check, bank cashier's check, or United States postal money order payable to the Securities and Exchange Commission. The payment shall be delivered or mailed to the Office of Financial Management,

7

Securities and Exchange Commission, Operations Center, 6432 General Green Way, Mail Stop

0-3, Alexandria, Virginia 22312, and shall be accompanied by a letter identifying Vinod Gupta

as a defendant in this action; setting forth the title and civil action number of this action and the

name of this Court; and specifying that payment is made pursuant to this Final Judgment.

Defendant shall simultaneously transmit photocopies of such payment and letter to the

Commission's counsel in this action.  If Defendant fails to make payment by the date agreed

and/or in the amount agreed according to the schedule set forth above, all outstanding payments

under this Final Judgment, including post-judgment interest, minus any payments made, shall

become due and payable immediately without further application to the Court.  Defendant shall

pay post-judgment interest on any delinquent amounts pursuant to 28 USC § 1961.  The

Commission shall remit the funds paid pursuant to this paragraph to the United States Treasury.

X.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that with respect to

Defendant's ownership or control, directly or indirectly, of voting stock of Info, the following

conditions shall apply from the date of this Final Judgment.  With respect to any and all matters

presented for a vote of the stockholders of the Company, or the taking of corporate action by the

written authorization or consent of security holders, whether at an annual or special meeting of

the Company or otherwise, Defendant shall vote or cause to be voted all shares of the Company

of which he is a beneficial owner, as such term is defined in Rule 13d-3 of the General Rules and

Regulations under the Securities Exchange Act of 1934, or shall grant authorization or execute

consents with respect to all such shares, in proportion to the votes, authorizations or consents of

the holders of all other outstanding shares of common stock who cast votes, grant authorizations

8

or execute consents for or against the matter(s) presented.  Defendant shall not grant an authorization or execute a consent for the taking of corporate action (1) pursuant to an agreement with another holder in the class of common stock or (2) with respect to any matter in which all other security holders have not been given an equal opportunity to grant authorizations or execute consents.  These conditions shall not apply to any vote by Defendant:

(a)  pursuant to the Voting Agreement dated as of March 8, 2010 among Omaha Holdco, Inc., Info, and the Defendant (the "Voting Agreement") in connection with the proposed merger of an affiliate of CCMP Capital Advisors, LLC with and into Info, as announced on March 8, 2010; or

(b)  pursuant to a voting agreement executed in the future by Defendant with an entity that, on or before March 29, 2010, submits a bid for all Info stock that Info's Board of Directors determines to pursue, so long as such voting agreement is substantially similar to the Voting Agreement and the transaction contemplated by such voting agreement provides for an all cash purchase of all Info stock in a transaction after which the company's securities are no longer registered under the Exchange Act or publicly traded (a "Potential Transaction") and the Defendant will not have any role in or relationship with the enterprise continuing after the Potential Transaction, whether as a director, officer, consultant or in any other capacity; or

(c) in the event neither transaction described in paragraphs (a) or (b) above occurs, against any potential merger, consolidation, sale, disposition, dissolution or other similar transaction involving Info or any of its subsidiaries or any of their equity, business or assets (whether directly or indirectly, in one transaction or a series of transactions, by operation of law or otherwise) if the Defendant will be offered an amount or form of consideration per share of Info

9

common stock which is less than the amount or different from the form of consideration per share offered to any other holder of Info common stock.

XI.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that the Consent is incorporated herein with the same force and effect as if fully set forth herein, and that Defendant shall comply with all of the undertakings and agreements set forth therein.

XII.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that this Court shall retain jurisdiction of this matter for the purposes of enforcing the terms of this Final Judgment.

XIII.

There being no just reason for delay, pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, the Clerk is ordered to enter this Final Judgment forthwith and without further notice.

Dated:  March 17, 2010                    BY THE COURT:


                                         s/ Joseph F. Bataillon
                                         UNITED STATES DISTRICT JUDGE

10

# EXHIBIT B

# REDACTED